UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BRIAN HODAK, et al.,                    )
                                        )
        Plaintiffs,                     )
                                        )
    vs.                                 )        Case No.   4:04CV01099 ERW
                                        )
CITY OF ST. PETERS, et al.,             )
                                        )
        Defendants.                     )

## MEMORANDUM AND ORDER

This matter comes before the Court upon Defendants' Motion for Summary Judgment
[doc. #32] and Defendants' Motion to Strike Plaintiffs' Opposition to Defendants' Motion for
Summary Judgment [doc. #45].

### I.  BACKGROUND

Plaintiff Karla Hodak is the sole owner of H/N Planning and Control, Inc. ("H/N").  On
April 1, 1997, H/N purchased C. Blake's Bar & Grill ("Bar") in St. Peters, Missouri.

A.  Incident on October 18, 2001

On the evening of October 18, 2001, Plaintiff Brian Hodak was at the Bar.  Around
11:00 p.m that evening, Brian Fitchett, a patron at the Bar,  became angry when the bartender
would not serve him additional alcohol.  Fitchett threw a nearby beer bottle in the direction of the
head of the Bar's disc jockey.  The bottle hit a mirror on the wall, and the mirror shattered,
sending glass throughout the bar and onto other patrons.  At this time, Plaintiffs did not employ
any bouncers, and Mr. Hodak would "act as a security officer" when patrons became rowdy or
violent.  Thus, after Mr. Fitchett broke the mirror, Mr. Hodak grabbed him in a "full nelson" and
"pushed him out" of the Bar.

Mr. Hodak immediately took Mr. Fitchett outside the Bar because he believed him to be a danger to the other patrons. Through a combination of "tripping and tackling" Fitchett, Mr. Hodak took Mr. Fitchett outside into the Bar's parking lot. Mr. Fitchett landed face down in the parking lot with Mr. Hodak on top of him. As Mr. Hodak was leading Mr. Fitchett outside, Mr. Hodak instructed his bartender, Peggy Geldien,[1] to call the police. Mr. Fitchett continued to struggle the entire time that Mr. Hodak was pinning him to the ground.

Three officers responded to the scene. Upon their arrival, Mr. Hodak and Mr. Fitchett were on the ground approximately 8-10 feet outside the Bar's front door.[2] Mr. Hodak and Mr. Fitchett had fallen to the ground after tripping over the concrete parking block located in the first parking space outside the entrance to the Bar. Officer Robert Treadway spoke with both Mr. Fitchett and Mr. Hodak regarding the events that took place earlier in the Bar. Mr. Fitchett admitted that he caused a peace disturbance in the bar, but he stated that he had thrown the bottle against the floor, not the wall. Mr. Fitchett also gave Officer Treadway a false name.[3] The Officers also learned sometime that evening that Mr. Fitchett had outstanding arrest warrants. Officer Treadway learned that Mr. Hodak was the owner and operator of the Bar, and Karla Hodak informed Office Treadway that she wanted to press charges against Mr. Fitchett. Likewise, Mr. Fitchett indicated he wanted to press charges against Mr. Hodak, and Officer Treadway issued a summons to Mr. Hodak for assault. Officer Treadway had the discretion not to issue the summons to Mr. Hodak for the offense of assault if he had determined Mr. Fitchett

---

[1] Peggy Geldien was the bartender that evening. Ms. Geldien is the daughter of Defendant Tom Brown.

[2] The testimony of witnesses differs as to exactly how far from the Bar's front door Mr. Hodak and Mr. Fitchett were when they fell to the ground.

[3] Officer Treadway cited Mr. Fitchett with the criminal offense of Impeding the Duties of a Police Officer in response to Mr. Fitchett giving the name of his brother instead of his own name.

was lying, but "in Treadway's mind he was compelled to issue the summons to Hodak because Fitchett asked him to."

Mr. Hodak was handcuffed and placed in the rear seat of the police vehicle of Officer Charles Cason[4] without resistance. Mr. Hodak suffers from claustrophobia and began to have an anxiety attack. He started having difficulty breathing, began to feel dizzy and see stars, and feared he was possibly about to faint. Still handcuffed, he was able to position himself in the seat so that he could "rap" on the window to get the Officers' attention. Officer Timothy Kaiser, the third officer at the scene, heard the noise and opened the car door so that Mr. Hodak "could get some air and so that he wouldn't feel so closed in should his condition be, you know, legitimate."

Mr. Hodak told Officer Kaiser that he was claustrophobic, having an anxiety attack and having trouble breathing. Mr. Hodak stepped out of the car to catch his breath. Both Karla Hodak and Peggy Geldien told the Officers that Mr. Hodak was suffering from a legitimate panic attack. Officer Kaiser repeatedly told Mr. Hodak to "get back in the vehicle." Mr. Hodak did not voluntarily get back in the vehicle. He repeatedly asked the Officers to allow him to catch his breath. He also asked that they take him to the police station and not just make him sit in the police car unattended.

Mr. Hodak struggled to stay outside the car. His body was erect and stiffened. According to Mr. Hodak, at this time, Officer Kaiser began using some "grabs, holds, pinches and pain tactics." Mr. Hodak also felt like he was being choked by something around his neck. Ms. Geldien saw Officer Kaiser using a baton to choke and strike Mr. Hodak.[5] Choke and strangle

---

[4]The Complaint [doc. #1] and Amended Complaint [doc. #23] indicate that the spelling of Officer Cason is "Carson"; however, in all other papers filed in this case, the name appears as "Cason." The Court will use the predominate spelling of "Cason."

[5]All three Officers deny using a baton against Mr. Hodak on October 18, 2001. The use of a baton was specifically prohibited as a means of force by the St. Charles Police Department at that time.

holds are expressly prohibited under the St. Charles Police Department's Use of Force Policy.[6] The use of a baton is also expressly prohibited as a means of force. In addition to the choke and strangle holds, Officer Kaiser used approximately three "knee strikes" against Mr. Hodak's knees and thighs, resulting in severe bruising to Mr. Hodak's leg. Under the City of St. Peter's Use of Force Policy, officers are only authorized to use knee strikes for the purpose of defending themselves against unlawful assaults.[7] Eventually, since the knee strikes were ineffectual, Officer Kaiser abandoned the tactic.

At this time, Officers Treadway and Cason noticed Officer Kaiser attempting to get Mr. Hodak back into the vehicle. Officer Treadway approached Officer Kaiser and Mr. Hodak and grabbed the free arm of Mr. Hodak. Officers Treadway and Kaiser "grabbed [Hodak] in like a modified transport like a grip," an "escort position." In an escort position, the officers and suspect "are slightly pulled off balance, your hip to their hip." Each officer has one hand squeezing the shoulder area and the other hand is lower on the suspect's body. At some point, Mr. Hodak kicked out his legs and sat on the ground. Officers Kaiser and Treadway lifted Mr. Hodak and Officer Cason grabbed his legs. The Officers carried Mr. Hodak to the vehicle, while Mr. Hodak was screaming that he was claustrophic and needed to breathe. He said he was having an anxiety attack and repeatedly asked to let him catch his breath. Although Officer Cason stated that he doubted that Mr. Hodak was having a panic attack, Officer Cason did roll down the windows in his patrol car to coax Mr. Hodak back inside the vehicle. Officers Kaiser and Treadway claim that they wanted to get Mr. Hodak back into the vehicle because there were approximately 12 patrons of the Bar outside that were starting to get hostile and yell obscenities.

---

[6]Defendants complain that the policies relied on by Plaintiff have not been authenticated as true and accurate. However, according to Plaintiffs, Defendants certified the policies in their Rule 26 Supplemental Disclosures.

[7]Defendants claim that St. Peters police officers are trained to use knee strikes "above the knee and the hip on the side of the leg" as a distraction technique to make a suspect "comply with whatever [an officer is] attempting to do."

Furthermore, Mr. Hodak was struggling "right next to the roadway." Officer Treadway insists he was concerned about his safety, the safety of Mr. Hodak and the safety of the bystanders. Officers Cason and Treadway both admit that they had the opportunity and ability to stop Officer Kaiser's use of force against Mr. Hodak, but each felt that the amount of force used by Officer Kaiser was completely justified.

Mr. Hodak was charged with and convicted of resisting arrest. However, his conviction was reversed on appeal. *See City of St. Peters v. Hodak*, 125 S.W.3d 892 (Mo. Ct. App. 2004). There was no further prosecution for the resisting arrest charge. Mr. Hodak was acquitted on the underlying assault of Mr. Fitchett. The Police Department also conducted an internal investigation regarding the actions of the Officers toward Mr. Hodak.[8] Plaintiff claims that he was treated by a psychiatrist starting in October 2002 for post-traumatic stress disorder triggered by the events during the evening of October 18, 2001. He was prescribed medications of Ambien, Zoloft and Xanax.

B. Liquor License and Police Presence

The Bar had a liquor license. According to the St. Peters' Municipal Code, all businesses holding a City liquor license must maintain "an orderly place or house." St. Peters'

---

[8]It is unclear how the investigation was initiated. Mayor Tom Brown claims that he spoke with the Police Chief regarding the conduct of the Officers. There is also evidence that Peggy Geldien, Mayor Brown's daughter, spoke with her father regarding the incident, but he referred her to the Chief of Police, who then referred her to Sergeant Ed Gilliam. Sergeant Gilliam, the Officer who conducted the investigation, did not receive any referral to conduct an internal investigation from Mayor Brown.

Municipal Code § 600.710.[9]  This Code provision must be read together with the Missouri state

regulations.  According to the Missouri State Supervisor of Liquor control,

> (A) At no time, under any circumstances, shall any licensee or his/her
> employees fail immediately to prevent or suppress any violent quarrel, disorder,
> brawl, fight or other improper or unlawful conduct of any person upon the
> licensed premises.
> (B) In the event that a licensee or his/her employee knows, or should have
> known, that an illegal or violent act has been committed on or about the
> licensed premises, they shall immediately report the occurrence to law
> enforcement authorities.

11 Mo. Code of State Regulations 70-2.130(13)(A) and (B) (2005).  Once the police arrive, it is

the duty of the police officers to see that the provisions of the city ordinances relating to the sale

---

[9]That code provision provides in full:

A. Regardless of and notwithstanding the provisions at Section 600.710 or any
other ordinance, if it is shown upon hearing before the Board of Aldermen that
any licensee under this Chapter has not, at all times, kept an orderly place or
house, or has violated any of the provisions of this Chapter, then the Board of
Aldermen may revoke the license of any such licensee.  The Board of Aldermen
shall first, upon their own motion, direct a notice of the date, time and place of
such hearing, which hearing shall not be held less than twenty (20) days after
service of such notice, setting forth the grounds upon which such license is
sought to be revoked, and commanding the licensee to appear and show cause
why such license should not be revoked.  Such notice shall be served by a City
Police Officer upon the licensee, or upon an officer of the licensee if a
corporation, or upon any employee of the licensee at the time of service in
charge of the place of business licensed.  The licensee shall have the right to
counsel and to produce witnesses in his/her own behalf in such hearing.  Such
hearing shall be conducted as other Board of Aldermen proceedings are
conducted.  No license shall be revoked except upon vote therefore by a
majority of all the members elected to the Board of Aldermen, the Mayor
having no vote except in case of a tie vote by all members elected to the Board
of Aldermen.
B.  The Board of Aldermen may whenever it shall be shown or upon
recommendation of the Commissioner, that a person licensed hereunder has not
at all times kept an orderly place or house, or has violated any of the provisions
of this Chapter, the Board of Aldermen may suspend, for a maximum of one
hundred twenty (120) consecutive days, the license of that person, but the
licensee must have ten (10) days' notice of the action to suspend his/her license
prior to the order of suspension issuing.  If requested by the licensee in writing,
a hearing shall be held as provided in Subsection (A) above.

of intoxicating liquor and/or non-intoxicating beer are obeyed. *See* St. Peters' Municipal Code §
600.695. The City of St. Peters has implemented a point system, whereby the City's Liquor
Commission ("Commission") will review incidents reported by the police and assign points for
certain defined violations. *See* St. Peters' Municipal Code § 600.710. Points are not
automatically assigned just because the police are called. *Id.* "Each case will be reviewed and
where management has acted responsibly, all that will occur is notification in writing that [the
Commission] reviewed the case." *Id.* If the Commission decides to assign points against an
establishment's liquor license, the owner is given an opportunity to present his side of the incident
before a final decision is made. *Id.*

Mr. Hodak was a vocal critic of local government officials, including the mayor at the
time, Tom Brown. He wrote several letters to the editor of the local paper including:

> November 11, 2000, "When will the fleecing of the tax payers stop?";
> November 20, 2000, "Taxpayers get stuck with stormwaters costs";
> January, 2001, "Don Kohl's (Municipal Judge) candidacy: some background";
> February 12, 2001, "When will voters finally face the music?";
> May 28, 2001, "Why TIFs don't make economic sense";
> December 10, 2001, "Taking a closer look at a St. Peters use tax"; and
> February 6, 2002, "Subverting due process over a service station."

Plaintiffs claim that on or about November 1, 2001, Mayor Tom Brown appeared at the Bar and
told both of them that if Mr. Hodak did not stop criticizing his tax increment financing plans, he
would see to it that they lost their liquor license.[10] Mr. Hodak's February 6, 2002 letter made
claims that Mayor Brown had denied BP Amoco's due process regarding a use permit because
Mayor Brown did not like the green and yellow colors of Amoco, and the Mayor's denial of due
process needlessly cost the taxpayers money defending a lawsuit initiated by Amoco following the
denial of a use permit. Ms. Hodak claims that on February 7, 2002, the day following the letter's
publication, Mayor Brown called and told her to tell Mr. Hodak to "keep his . . . mouth shut or

---

[10]Mayor Brown denies making this statement.

you're going to lose your liquor license." One of the City's Board of Aldermen, Michelle Steins recognized that revoking Plaintiffs' liquor license had "become a vendetta" for Mayor Brown. There is also evidence that Mr. Hodak informed the Bar's employees during a Christmas party on December 16, 2001 that the party would likely be the last because a City official had threatened to take their liquor license.

From April 1, 1997 to October 18, 2001, Plaintiffs were assessed no points against their Bar's liquor license. Between October 2001 and March 2002, the Commission assessed 12.5 points against the Bar's liquor license for various violations including 2 points for a peace disturbance and assault, 3.5 points for a disturbance resulting in a DWI arrest, 3.5 points for minors drinking, and 3.5 points for failure to maintain a closed business.

The 2 points for the peace disturbance and assault were assessed for the incident that took place on October 18, 2001 with Mr. Hodak and Mr. Fitchett. On April 30, 2002, Mr. Hodak was acquitted of the assault against Mr. Fitchett. Alderman Len Pagano admits that if Mr. Hodak was not guilty of the underlying assault charge, he believes points should not have been assessed in this case.[11] A member of the Liquor Commission, Rhonda Shaw, testified that the 3.5 points were assessed because the Bar failed to call the police after a fight broke out in the Bar. The men involved in the fight were forcibly removed from the Bar, and once outside, one of the men broke a window of the Bar before driving away. However, Ms. Shaw admitted that the police report indicated that the man who called the police that evening was employed by the Bar as a bouncer. Finally, she claimed that the 3.5 points assessed for minors drinking were necessary because Plaintiffs could not demonstrate that the fake identification of the minors was of deceptive quality. However, Ms. Shaw concedes that the Plaintiffs had no power to subpoena the fake licenses used by the minors to provide them to the Commission.

---

[11]However, the Court notes that a liquor license may be revoked for violation of liquor laws even though the licensee has been acquitted of an underlying criminal charge. *See Crooms v. Ketchum*, 379 S.W.2d 580 (Mo. 1964).

Karla Hodak appealed each assessment and a hearing was held before the Commission for each violation. In every case, the assessment of points was upheld.[12] On May 24, 2002, the Commission sent notice to Ms. Hodak that the Commission had recommended to the City's Board of Aldermen ("Board") that the Bar's liquor license be revoked. On June 13, 2002, the Board held a hearing regarding the revocation of Plaintiffs' liquor license.[13]

Ms. Shaw testified at the June 13, 2002 hearing in front of the Board regarding the points assessed by the Commission. Some members of the Board generally disliked Mr. Hodak because of his public criticism of city officials. Approximately one week before the hearing began on June 13, 2002, each member of the Board received all the evidence which was to be introduced during the hearing. There is evidence that the decision to revoke Plaintiffs' liquor license had been made in a meeting prior to the hearing, and that it had been decided that Alderwoman Michelle Steins would make the motion to revoke the license after the hearing concluded. In this pre-hearing meeting, the Alderpersons had been instructed to sit quietly and not ask any questions during the hearing. In the middle of the hearing, Mr. Hodak motioned to have Mayor Brown recused from sitting in the hearing. Mayor Brown recused himself after the evidence offered by the City had been received into evidence. Mr. Hodak claims he was not given an opportunity to object to the evidence being received. At the end of the hearing, the Board unanimously voted to affirm the recommendation of the Commission to revoke Plaintiffs' liquor

---

[12]At its December 11, 2001 meeting, the Commission heard the appeal of the assessment of points based on the October 18, 2001 incident, and the assessment was upheld. At its May 7, 2002 meeting, the Commission heard the appeal of the assessment of points based on incidents occurring on November 3, 2001, December 8, 2001, and March 7, 2002, and all of the assessments were upheld.

[13]In the preceding 23 years in the City of St. Peters, the Board of Aldermen had never conducted a hearing to revoke a business' liquor license. In the five years prior to October 2001, only one other establishment had accumulated more point assessments than Plaintiffs' Bar. In that case, the establishment's liquor license was not revoked; instead, the business was put on probation.

license.[14]  Plaintiffs sold the Bar on June 13, 2002.  They did not seek judicial review of the Board's decision to revoke their liquor license.

Mr. Hodak also claims that in October 2001, the presence of marked police cars and uniformed officers at the Bar increased dramatically at the direction of Mayor Brown.  Mr. Hodak believes that the increased police presence was an attempt by Mayor Brown to force Plaintiffs out of business, asseverating that the increased presence of the police deterred patrons from frequenting the Bar, causing monthly sales revenue to drop dramatically.  The Police Chief claims that he was never instructed by Mayor Brown or any other city employee to increase police surveillance at the Bar.  Mayor Brown also insists that he never instructed any member of the police department to increase surveillance at the Bar.

Brian and Karla Hodak filed suit against the City of St. Peters, former Mayor Tom Brown, Officer Timothy Kaiser, Officer Robert Treadway and Officer Charles Cason on August 19, 2004, seeking damages pursuant to the First, Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. §§ 1983, 1985(3) and 1988. In Count I, Plaintiffs allege that Defendant City of St. Peters and Defendant Brown retaliated against Mr. Hodak for the exercise of his First Amendment rights of free speech by placing marked cars and uniformed officers in the immediate vicinity outside of the Bar, and thereafter, revoking the liquor license of Plaintiffs.  In Count II, Plaintiffs allege that Defendant City of St. Peters and Defendant Brown violated their rights to procedural due process because the Board of Aldermen revoked the liquor license of the Bar, at the direction of Defendant Brown, in a hearing that was not based on an independent, impartial decision of the Board of Aldermen.  In Count III, Plaintiffs allege that Officers Kaiser, Treadway and Cason used excessive force during the arrest of Mr. Hodak on October 18, 2001.  In Count IV, Plaintiffs allege that Officers Kaiser, Treadway and Cason falsely

_____

[14]Defendants note, and the Court recognizes, that Mayor Brown did not vote in the Board's decision to adopt the Commission's recommendation to revoke Plaintiffs' liquor license.

imprisoned Mr. Hodak during the arrest on October 18, 2001. Count V contains allegations of malicious prosecution pursuant to 42 U.S.C. § 1983. In Count VI, Plaintiffs allege that Officers Kaiser, Treadway and Cason illegally failed to intercede on behalf of Mr. Hodak during his arrest on October 18, 2001.

## II. SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Crumley v. City of St. Paul*, 324 F.3d 1003, 1006 (8th Cir. 2003). The United States Supreme Court has noted that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 1).

"'By its terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for judgment; the requirement is that there be no *genuine* issue of *material* fact.'" *Hufsmith v. Weaver*, 817 F.2d 455, 460 n.7 (8th Cir. 1987) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis added by Supreme Court)). Material facts are "those 'that might affect the outcome of the suit under governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 247-48). Summary judgment will be denied due to a material issue of genuine fact if "the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." *Crumley*, 324 F.3d at 1006. Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at

322-23, *quoted in St. Jude Med., Inc. v. Lifecare Intern., Inc.*, 250 F.3d 587, 595 (8th Cir. 2001).

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. *Crumley*, 324 F.3d at 1006 (citing *Lynn v. Deaconess Med. Ctr.-W. Campus*, 160 F.3d 484, 487 (8th Cir. 1998)). The burden then shifts to the non-moving party who must set forth specific evidence showing that there is a genuine dispute as to material issues. *Anderson*, 477 U.S. at 249. To meet its burden, the non-moving party may not rest on the pleadings alone and must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

In analyzing summary judgment motions, the court must view the evidence in the light most favorable to the non-moving party. *Crumley*, 324 F.3d at 1008. The non-moving party is given the benefit of any inferences that can logically be drawn from those facts. *Matsushita*, 475 U.S. at 586. The court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000). The court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." Id.

### III. DISCUSSION

A. COUNT I - First Amendment Retaliation

Plaintiffs allege that Mayor Brown and the City of St. Peters retaliated against them because of Mr. Hodak's critical letters to the editor. In order

> [t]o establish a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity.

*Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004). "The causal connection is generally a jury question, but it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury." *Id.* (quoting *Naucke v. City of Park Hills*, 284 F.3d 923, 927-28 (8th Cir. 2002)).

Defendants do not argue that the publication of Mr. Hodak's published letters was not a protected activity. Instead, Defendants argue that there is no causal connection suggesting that the Bar's liquor license revocation and any increase of police presence were motivated by retaliation for the criticism of Mayor Brown in Mr. Hodak's articles. Specifically, Defendants argue that (1) there was not an increase of police surveillance; (2) Plaintiffs have presented no evidence that Mayor Brown or any other city official ordered an increase of police surveillance; (3) 9 of the 12.5 points assessed to Plaintiffs were assessed after the Plaintiffs called the police and the police responded; (4) all of the points against the Bar's liquor license were properly and lawfully assessed due to liquor violations and not because of Mr. Hodak's letters; and (5) the time delay between Mr. Hodak's first letter published in November 2000 and the revocation in June of 2002 suggests that the revocation was not related to Mr. Hodak's protected First Amendment activities.

The court must view the evidence in the light most favorable to the non-moving party. *Crumley*, 324 F.3d at 1008. Here, Plaintiffs have provided sufficient evidence to create a material issue of fact regarding the alleged retaliation by Mayor Brown. Plaintiffs have provided evidence of Mayor Brown's retaliatory motive. Ms. Steins believed that Mayor Brown had a vendetta against Mr. Hodak because of Mr. Hodak's unflattering, critical letters, which were published in the local newspaper. Plaintiffs claim that Mayor Brown approached them in the Bar on or about November 1, 2001 and told Mr. Hodak to stop criticizing tax increment financing or he would see to it that Plaintiffs lost their liquor license. It was shortly after Mayor Brown's visit that Plaintiffs noticed "police officers for the City of St. Peters in marked cars and with uniformed officers,

consistently remained stationed outside of the premises. . . during normal business hours."
Plaintiffs claim that the shear volume of police presence at the Bar suggests Mayor Brown and
other city officials had coordinated to put Plaintiffs out of business. While Plaintiffs are unable to
provide direct evidence that specifically shows Mayor Brown or other city officials gave orders to
the Police Chief and officers to increased surveillance,[15] Plaintiffs have provided circumstantial
evidence that the presence of uniformed officers in marked cars increased right after Mayor
Brown threatened Plaintiffs. Furthermore, Plaintiffs have provided evidence of a sharp decline in
sales revenue during this time.

After Mr. Hodak's February 6, 2002 letter was published, Ms. Hodak claims that she
received another threatening phone call from Mayor Brown. Mayor Brown allegedly told Ms.
Hodak to tell her husband to "keep his. . .mouth shut or you're going to lose your liquor license."
During the more than four years of operation from April 1, 1997 to October 17, 2001, Plaintiffs
had no points assessed against their liquor license. From October 2001 to March 2002, in a
period of less than six months, the Commission assessed 12.5 points against Plaintiffs' liquor
license for various violations. Plaintiffs have presented evidence that some of the assessments
were unjustified. On May 24, 2002, a little over three months after the second alleged threat by
Mayor Brown, Plaintiffs received notice that the Commission had sent the Board a
recommendation to revoke the Bar's liquor license. There is evidence that the decision to revoke
the license was made prior to the hearing. Plaintiffs' license is the first liquor license to have been
revoked in St. Peters.

Plaintiffs specifically dispute whether the points assessed by the Commission were
proper and lawful. Plaintiffs have provided evidence that suggests many of the points may have
been improperly assessed, regardless of whether the police were responding to a call or were

---

[15]Mayor Brown and the Police Chief both deny that Mayor Brown instructed the police to
increase surveillance of the Bar.

there on their own accord. Furthermore, Defendants' claim that there was a time delay between the first letter and the liquor license revocation is not persuasive. From October 2001 to May 2002, Plaintiff wrote two of his letters, the Commission assessed 12.5 points against the Bar, Mayor Brown allegedly threatened Plaintiffs on two occasions, and ultimately Plaintiffs' liquor license was revoked. This Court finds that a reasonable factfinder could find that Defendants retaliated against Plaintiffs based on Mr. Hodak's criticism of Mayor Brown and other city officials. Thus, summary judgement will be denied as to Count I.

B. <u>COUNT II - Procedural Due Process Violation</u>

Plaintiffs claim that Defendant Brown and Defendant City of St. Peters violated their right to procedural due process when the City revoked the Bar's liquor license. The Fourteenth Amendment guarantees that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." "The procedural component of the Due Process Clause protects property interests created not by the Constitution but by rules or understandings that stem from an independent source such as state law." *Neal v. Fields*, 429 F.3d 1165, 1167 (8th Cir. 2005) (quoting *Town of Castle Rock v. Gonzales*, 125 S.Ct. 2796, 2803 (2005)). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 899-900 (8th Cir. 1994) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). "Due process is a flexible concept that varies with the particular situation." *Id.* In a case where an individual complains that a hearing was not fair and impartial, plaintiff must establish (1) a deprivation of a constitutionally protected liberty or property interest, (2) state action, and (3) constitutionally inadequate process. *Artistic Entm't., Inc. v. City of Warner Robins*, 134 Fed. Appx. 306, 309 (11th Cir. 2005).

Defendants argue that assuming *arguendo* that the City deprived Plaintiffs of a property interest upon revoking the Bar's liquor license, Plaintiffs failed to exhaust their state remedies prior to bringing this claim in federal court. According to the Supreme Court,

> The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law.

*Zinermon v. Burch*, 494 U.S. 113, 126 (1990).  In this case, Plaintiffs did not seek judicial review of the revocation in state circuit court prior to filing the instant case.  In general, a revocation of a liquor license may be appealed to the appropriate Missouri circuit court.  *See City of Boonville v. Rowles*, 869 S.W.2d 889 (Mo. Ct. App. 1994); *Mandacina v. Liquor Control Bd. of Review of the City of Kansas City*, 599 S.W.2d 240 (Mo. Ct. App. 1980); *Johnson v. Watkins*, 298 S.W.2d 535 (Mo. Ct. App. 1957).  Plaintiffs argue that they had no standing to pursue an appeal since on June 13, 2002, Plaintiffs sold the Bar and no longer had an ownership interest in the Bar nor any other bar or restaurant.  In *City of Boonville v. Rowles*, the court addressed this precise issue.  The court held that a case is not mooted if a licensee sells the establishment prior to appealing a revocation of a liquor license because "the City's disciplinary action affects their ability to obtain or maintain a liquor license and a decision by this court reversing the suspension could provide them relief."  869 S.W.2d at 892.  Thus, this Court holds that Plaintiffs failed to properly exhaust all state remedies.  Count II will be dismissed.

## C.  COUNT III - Excessive Use of Force

Plaintiffs allege that Officers Kaiser, Treadway and Cason (the "Officers") employed the use of excessive force in effectuating the arrest of Mr. Hodak on the evening of October 18, 2001 in violation of the Fourth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.  The Officers argue that (1) the force used was reasonable; (2) the injuries to Mr. Hodak were minimal and (3) they are shielded by qualified immunity.

In *Harlow v. Fitzgerald*, the Supreme Court established that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  457 U.S. 800, 818 (1982).  "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted."  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (qualified immunity protects actions that fall in the "hazy border between excessive and acceptable force"); *Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct");  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) ("qualified immunity standard 'gives ample room for mistaken judgments'"); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (unlawfulness of actions must be apparent for qualified immunity not to apply); *Wertish v. Krueger*, 433 F.3d 1062 (8th Cir. 2006).  The purpose of providing government officials with qualified immunity is so that "officials can know that they will not be held personally liable as long as their actions are reasonable in light of current American law." *Anderson*, 483 U.S. at 646.

The Supreme Court explained that courts should undertake a two-part inquiry in order to determine whether an official is entitled to qualified immunity.  The first question is whether the plaintiffs' allegations, if true, establish a constitutional violation.  *Brosseau*, 543 U.S. at 197; *Saucier*, 533 U.S. at 201, *Wertish*, 433 F.3d at 1066.  If no constitutional right would have been violated were the allegations established, plaintiffs are not entitled to damages, and no additional analysis is required.  *Saucier*, 533 U.S. at 201; *Wertish*, 433 F.3d at 1066; *Lockridge v. Bd. of Trs. of the Univ. of Ark.*, 315 F.3d 1005, 1008 (8th Cir. 2003).  On the other hand, if a violation can be proved, the second step is to ask whether, viewing the facts in a light most favorable to the party asserting the violation, the right was clearly established at the time of the official's conduct. *Brosseau*, 543 U.S. at 198; *Hinshaw*, 2006 WL 212372, at *4; *Craighead v. Lee*, 399 F.3d 954, 961 (8th Cir. 2005).  The right must exist "in a more particularized, and hence more relevant,

sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640; *see also, Brosseau*, 543 U.S. at 199; *Saucier*, 533 U.S. at 202.

Excessive force claims under the Fourth Amendment are analyzed under a "reasonableness" standard. *Graham v. O'Connor*, 490 U.S. 386, 395 (1989); *Wertish*, 433 F.3d at 1066*; Craighead*, 399 F.3d at 961; *Schultz v. Long*, 44 F.3d 643, 649 (8th Cir. 1995) ("The Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within a range of conduct which is objectively 'reasonable' under the Fourth Amendment"). "It is well settled that police officers may use some degree of force in effecting a lawful arrest." *Krueger v. Fuhr*, 991 F.2d 435, 438 (8th Cir. 1993). The test is whether an officer's actions are "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Graham*, 490 U.S. at 397.

The reasonableness inquiry must allow for the fact that "police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Id*. The Supreme Court further observed in *Graham* that the reasonableness test is "not capable of precise definition or mechanical application," and "requires careful attention to the facts and circumstances of each particular case." *Id*. at 396. Specifically, the Court shall analyze all the facts, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*; *see also Wertish*, 433 F.3d at 1066.

In deciding whether the Officers are lawfully protected from liability by the doctrine of qualified immunity, the Court must first determine whether, if true, Plaintiffs' allegations establish a constitutional violation. Plaintiffs argue that the Officers' use of force was not reasonable. The

Officers chose to arrest Mr. Hodak for assaulting Mr. Fitchett; however, they knew that Mr. Fitchett had caused a disturbance in the Bar and believed Mr. Hodak to be an owner of the Bar. Thus, the Court finds the severity of the underlying crime at issue was minimal. Furthermore, the suspect did not pose a threat to the officers. Indeed, there is evidence that Mr. Hodak told the Officers repeatedly that he was claustrophobic and was having an anxiety attack.[16] He never threatened any of the Officers, and there is no evidence that the Officers believed he had any weapons. Indeed, Mr. Hodak had been arrested earlier and placed in Officer Cason's vehicle without resistance. It was only after being left in the car for several minutes unattended that Mr. Hodak rapped on the window to get the Officers' attention because he was having an anxiety attack. It was one of the Officers that opened the door of the vehicle. Once Mr. Hodak was out of the vehicle, he did "struggle" to stay out of the vehicle, but there is no evidence that he attempted to flee to evade the arrest. Furthermore, Mr. Hodak was handcuffed during the entire incident. The Court notes that there were a dozen or so patrons standing outside the Bar that began to get hostile, and the ruckus had spilled a few feet into the parking lot that was near a roadway. Those in the crowd were yelling, telling the Officers that they were arresting the wrong person. Mr. Hodak, Mrs. Hodak and Ms. Geldien all told the Officers that Mr. Hodak had been diagnosed with claustrophobia and that he was having an anxiety attack. Mr. Hodak was repeatedly asking for the Officers to let him catch his breath. The Court holds that a reasonable factfinder could find that the Officers' response was unreasonable.

---

[16]The Eighth Circuit has held that an officer's use of force was not unreasonable when the officer did not know about a medical condition affecting a suspect. *See Wertish*, 433 F.3d at 1066 (man having diabetic reaction appeared uncooperative to police because police did not know suspect had diabetes); *Janis v. Biesheuvel*, 428 F.3d 795 (8th Cir. 2005) (force not unreasonable when police mistakenly thought that woman having a diabetic reaction was intoxicated). Here, the Officers knew that Mr. Hodak was having an anxiety attack brought on by claustrophia. Officer Cason's testimony that he doubted Mr. Hodak's claim that he was having an anxiety attack is belied by the fact that he attempted to coax Mr. Hodak back into the car by rolling down the window to ease Mr. Hodak's feelings of claustrophobia.

Defendants also argue that Mr. Hodak's injuries were de minimus. In *Andrews v. Fuoss*, the Eighth Circuit noted that "[a]lthough we have remarked that while it remains an open question in this circuit whether an excessive force claim requires some minimum level of injury, we have also held that a de minimis use of force or injury is insufficient to support a finding of a constitutional violation." 417 F.3d 813, 818 (8th Cir. 2005) (internal citations and quotations omitted). The result of the force becomes a factor in the reasonableness analysis. *Crumley*, 324 F.3d at 1007 (holding of no excessive force when suspect did not allege she suffered any physical injury from police officer's shove and no long-term damage from handcuffs being too tight). In this case, Mr. Hodak had significant bruising to his leg. Furthermore, there is testimonial evidence that he was diagnosed with post-traumatic stress disorder and prescribed medication following the incident. With all of the foregoing facts and circumstances in mind, this Court finds that there is a question of fact as to whether the force used by the Officers was reasonable.

Next, the Court must analyze whether the "right was clearly established at the time of the official's conduct." *Hinshaw*, 2006 WL 212372, at *4. The Officers believed the incident was "escalating" and responded with increased force against Mr. Hodak. Here, there is evidence that the Officers used choke holds, knee strikes and a baton to get Mr. Hodak back into the car. Defendants deny using a baton and implore the Court to evaluate the credibility of the witnesses. The use of choke holds and batons are expressly forbidden by the St. Peters' Police Department as a means of force, and such allegations are particularly troubling to this Court. Further, Plaintiffs have presented evidence that the use of knee strikes by an officer is only permitted to defend against a physical aggressor. Thus, Plaintiffs have presented sufficient evidence for a reasonable factfinder to find that Mr. Hodak's right to be free from holds, knee strikes and strikes from a baton was clearly established. Furthermore, a genuine issue of fact exists as to what force was used to effectuate the arrest. Summary judgement will be denied as to Count III.

D. COUNT IV and V- False Imprisonment and Malicious Prosecution

Plaintiffs allege that Mr. Hodak was the subject a false arrest and malicious prosecution. In order to survive a motion for summary judgment in an action for false arrest and malicious prosecution, the plaintiff must demonstrate that the police officers did not have probable cause to make an arrest.[17] *Kurtz v. City of Shrewsbury*, 245 F.3d 752, 757 (8th Cir. 2001). Plaintiffs argue that the Officers arrested Mr. Hodak without probable cause to believe that an offense was committed.[18] "Probable cause exists if the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed ... an offense." *Flynn v. Brown*, 395 F.3d 842, 844 (8th Cir. 2005) (quoting *Hannah v. City of Overland*, 795 F.2d 1385, 1389 (8th Cir.1986)). "A police officer who has probable cause to believe that a suspect has committed a crime is not liable for the state law tort of false arrest simply because the suspect is later proven innocent or the charges are dismissed." *Kurtz*, 245 F.3d at 757. In this case, the Officers were responding to a call about a fight or disturbance. When they arrived, they saw Mr. Hodak on top of Mr. Fitchett in front of the Bar in the parking lot. Mr. Fitchett had blood on his face from where he had fallen to the ground. Under Section 210.010 of the St. Peters' Municipal Code,

> A person commits the offense of assault if:
> 1. The person attempts to cause or recklessly causes physical injury to another person;
> 2. With criminal negligence the person causes physical injury to another person by means of a deadly weapon;
> 3. The person purposely places another person in apprehension of immediate physical injury;
> 4. The person recklessly engages in conduct which creates a grave risk of death or serious physical injury to another person;
> 5. The person knowingly causes physical contact with another person knowing the other person will regard the contact as offensive or provocative; or

---

[17]The Court notes that Defendants claim that the Eighth Circuit does not recognize a claim of malicious prosecution under § 1983. It is not necessary that this Court address Defendants' argument since Plaintiffs' claim fails on other grounds.

[18]The Court notes that while Plaintiffs' Count IV is entitled "False Imprisonment," the facts alleged and arguments made relate to a claim of false arrest. The Court will address the merits of a claim of false arrest.

6. The person knowingly causes physical contact with an incapacitated person, as defined in Section 475.010, RSMo., which a reasonable person, who is not incapacitated, would consider offensive or provocative.

Mr. Hodak was arrested for assault. It was reasonable for the Officers to believe that Mr. Hodak (1) had attempted to cause Mr. Fitchett physical injury and (2) put Mr. Fitchett in apprehension of immediate physical injury. The fact that Mr. Hodak was later acquitted of the assault charge does not affect the reasonableness of the Officers' belief at the time of the arrest. This Court finds that probable cause existed for the arrest. Thus, Counts IV and V will be dismissed.

F. COUNT VI - Failure to Intercede

Plaintiff alleges that Officers Cason and Treadway unlawfully failed to intervene when Officer Kaiser was employing the use of excessive force. An officer has a duty to prevent the use of excessive force by other officers if the officer can reasonably do so. *Webb v. Hiykel*, 713 F.2d 405, 408 (8th Cir. 1983). In particular, a plaintiff must show that the "officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). In this case, the Court already has found that there are questions of material fact that exist relating to the issue of whether the Officers employed excessive force.[19] While the Court found above that, as a matter of law Mr. Hodak was not unjustifiably arrested,[20] the Court found that a reasonable factfinder could find that Mr. Hodak's Fourth Amendment right to be free from unreasonable seizures was violated during the incident on October 18, 2001. Because genuine issues of fact remain on these predicate issues, summary judgment will be denied as to Count VI.

Accordingly,

---

[19]*See supra* discussion under Count III.

[20]*See supra* discussion under Count IV and V.

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [doc. #32] is **GRANTED in Part and DENIED in Part**. Only Counts II, IV and V will be **DISMISSED**. Summary Judgment is **DENIED** as to Counts I, III, and VI.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike Plaintiffs' Opposition to Defendants' Motion for Summary Judgment [doc. #45] is **DENIED**.

An appropriate order of dismissal will accompany this Order.

Dated this 16th day of February, 2006.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE